# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

# 20-398

DEVIN SANDERS

VERSUS

WOODLAWN CEMETERY, INC., ET AL.

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 201610641
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

# JOHN E. CONERY
# JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Shannon J. Gremillion, John E. Conery, and Sharon Darville Wilson, Judges.

**AFFIRMED.**

**Daniel A. Meyer**
**Bruno & Bruno, LLP**
**855 Baronne Street**
**New Orleans, Louisiana  70115**
**(504) 525-1335**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Devin Sanders**

**Dan Boudreaux**
**Keith R. Giardina Law Offices**
**9100 Bluebonnet, Suite 300**
**Baton Rouge, Louisiana  70809**
**(225) 293-7272**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Netherlands Insurance Company**

**Brian Arthur Gilbert**
**Conroy Law Firm**
**3501 North Causeway Boulevard, Suite 500**
**Metairie, Louisiana  70002-8345**
**(504) 830-3450**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Acme Mausoleum, LLC**

**L. Adam Thames**
**Taylor, Porter, Brooks, & Phillips, L.L.P.**
**Post Office Box 2471**
**Baton Rouge, Louisiana  70821-2471**
**(225) 387-3221**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Woodlawn Cemetery, Inc.**

**CONERY, Judge.**

Plaintiff sustained serious bodily injury when he fell through the skylight of a mausoleum at the defendant's cemetery in Crowley, Louisiana. At the time of the accident, Plaintiff was working as a crewmember for a subcontractor engaged to expand an existing mausoleum structure. He sustained serious bodily injury when he fell through a skylight on the roof of the original mausoleum while he was working on the project. The cemetery filed a motion for summary judgment, asserting that Plaintiff would not be able to prove that it had custody or control of the worksite nor would he be able to prove that it had actual or constructive notice of the alleged defect in the skylight prior to the accident. The trial court granted summary judgment dismissing Plaintiff's case, noting a lack of genuine issues of material fact concerning notice. Plaintiff appeals. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

This matter arose on July 13, 2015 when Plaintiff Devin Sanders, an employee of Architectural Concrete Products, Inc. (ACPI), was working on the roof of a mausoleum located on the grounds of a cemetery owned by defendant Woodlawn Cemetery, Inc. (Woodlawn), a non-profit organization. While working, Plaintiff fell through a skylight, on to the mausoleum floor below. He sustained spinal fractures resulting in lower body paraplegia.

The designated appellate record indicates that the mausoleum at which Plaintiff's accident occurred—and the skylight was located—was added to the premises in 1992 after Woodlawn contracted for its construction by Acme Mausoleum, LLC (Acme), a company focused on the development, construction, and selling of mausoleums.

Prior to the accident, Woodlawn sought an expansion of its mausoleum capacity and again contracted with Acme to add an addition to the existing structure. The resulting 2014 "Sales and Construction Contract" between Acme and Woodlawn indicated that Acme would plan, design, construct, and deliver the completed mausoleum addition to Woodlawn. In keeping with its usual business practice, Acme engaged Plaintiff's employer, ACPI, to actually complete the construction.

The February 10, 2015 "Construction Contract" between Acme and ACPI required the latter to "furnish all plant, labor and materials, and [to] perform all work required by the Contract Documents, for construction" of the mausoleum addition. ACPI also agreed, in part, to "be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work" and to "defend, indemnify and hold [Acme] harmless from all claims for damages to persons or property resulting from the fault of negligence" of ACPI. The contract additionally required ACPI to comply with all OSHA requirements in the performance of its work and "to assume all responsibilities of [Acme] with respect thereto, and to indemnify and hold harmless [Acme] from all penalties, damages or other losses resulting from failure to do so."

With construction underway, Plaintiff reported to work at the cemetery with other ACPI employees[1] on July 13, 2015. He and two other employees had been assigned as a replacement crew on the Woodlawn project, working under the direction of ACPI Superintendent/Foreman Mike Wright.

---

[1] Plaintiff explained in his deposition that he had been hired to work in "concrete" with ACPI but was unsure of his title since, "We did it all[.]" His experience with ACPI was exclusively working on jobs dealing with mausoleums.

For some reason not clear in the record, Plaintiff's work site was on the roof

of the existing mausoleum,[2] located adjacent to the addition being constructed.

---

[2] Plaintiff testified in his deposition that the supervisor directed him and his two co-workers to "get on the roof" by his ACPI supervisor.

In his own deposition, ACPI Superintendent Wright explained that, typically, as ACPI was constructing crypts, they would construct "a railing around the area" when they got "to a roof". At the time of the July 13, 2015 accident, however, a railing had not yet be put into place although the addition had been built "[p]robably more than midway to the roof."

Mr. Wright reported that Plaintiff and his two-coworkers arrived on the site the day of the accident after he had been informed that his regular crew would not be available that day. He explained the work situation on the day of the accident as follows:

Q.    What was on the agenda for work that day on July 13th when Nick, Quentin and Devin came to your site?

A.    What was on the record prior, before I knew my guys weren't showing up?

Q.    Let's do both.

A.    My guys, we had just set up our shoring and laid the deck.

Q.    Is that the roof?

A.    Correct. To pour the roof. Once we got the deck – This was on a Friday we got the deck work. I'm sorry. It was a Thursday. We don't work on Fridays. We got back on Monday and we normally, typically set up all the safety rails on the deck and get everything squared away to begin laying out the deck.

Q.    But your guys didn't know up, so you had to change plans?

A.    Correct.

Q.    To what?

A.    When Devin and the other guys showed up, I had them cutting parts that we would use to set up the roof forms. You have got to cut kickers, basically to line the form as it went around the roof. It's a whole bunch of pieces 2 x 4 about twelve inches long.

Q.    What was the size of the form that you were going to pour on the roof?

A.    It would have been a nine-inch thick slab. The form edge was nine inches. You had to cut a bunch of little kickers.

Q.    What was the condition of the roof, I guess at the time you guys arrived?

A.    The deck was down. And then we had our concrete. There is a deck. We would have poured the overhand.

George White, Jr., the Director of Acme, testified that, although the original mausoleum and the addition were entirely separate buildings that did not touch, the design called for "a half-inch expansion joint between the concrete wall of the existing mausoleum and the concrete wall of [the addition]."

---

Q.    Let me interrupt you for a second.

A.    Yes.

Q.    Were you using a metal deck?

A.    No.

Q.    What type of deck was it?

A.    Wood.  Plywood.

Q.    Go ahead.

A.    So the plywood deck, there's our concrete mausoleum that we poured which covers both of them.  Behind it is the existing mausoleum.  I had Devin and those guys on the existing building cutting parts, because there was no railing system set up out front.  So there's no need for them to be working.  We were not going to set any form work with them because my guys knew where everything was.  It would have taken too long.  I would have spent my whole day finding parts for them.  So I just set them up a saw.  And I said, "Look, you all set these 2 x 4s.  We need a hundred of these.  Three hundred of those."

Q.    Rip form kickers all day?

A.    Yes.  That was my plan for them.

Q.    So there was a mausoleum that you were building adjacent to an existing mausoleum?

A.    Right up against it.

Q.    It was almost like an extension?

A.    Yes.  Typical mausoleums they build phase one.  Then you pour phase two, phase three.  It just goes on and on and on.

Mr. Wright explained that the original mausoleum had been extended "several" times.

Plaintiff alleged in his petition that he was cutting lumber into roof-form support posts[3] and that he had taken a break to drink water, crouching on the rooftop as he did so. Plaintiff alleged that, when he stood up, he "fell backwards onto the dome-shaped skylight,[4] which failed to support his weight[.]" As a result, Plaintiff fell through the skylight and "onto the concrete crypt below[.]" The record indicates that Plaintiff sustained severe injuries, including lower-body paraplegia.

Plaintiff named Woodlawn, as premises owner, as a defendant[5] in this suit and alleged that his injuries were due to defects of the skylight. Citing premises liability under La.Civ.Code art. 2317 and La.Civ.Code art. 2317.1, Plaintiff contended that Woodlawn "had actual or constructive knowledge of the condition of the skylight."

In June 2019, Woodlawn filed a motion for summary judgment, asserting that

---

[3] In his deposition, Plaintiff explained that he and his two coworkers were "pulling up the trimming that's like on the sides of the building, pulling trimming, laying trimming, basically shaping it to fit the sides."

When asked about the "overall purpose" of ACPI's work at Woodlawn and whether "it was to add on to the existing mausoleum or build a new one[,]" Plaintiff responded:

      A.     I don't know because they was working on the back. It looked like they was about to build another one, but like I said, it was a previous mausoleum there. So I don't know. I'm not sure.

      Q.     Right. So there was a mausoleum already there when you got there, right?

      A.     And looked - - had the grounds in the back looked like they were laying another one, but I'm not sure.

      Q.     But specifically what they were asked to do would be something that I need to go to talk to ACPI?

      A.     Yes.

[4] Deposition testimony and statements by affidavit admitted into the record do not reflect an eyewitness account of Plaintiff's fall. Coworkers instead heard the fall. Plaintiff had no recollection of the actual event.

[5] Plaintiff also named Acme, a general contractor, as a defendant. Briefing to this court, however, indicates that Acme was dismissed via summary judgment due to a determination that it was Plaintiff's statutory employer. That ruling is not before this court. We therefore address Woodlawn as the sole defendant.

Plaintiff would be unable to prove that it had custody and/or control of the skylight at the time of the accident nor would he be able to prove that it had actual or constructive notice of the purported defect in the skylight. Woodlawn argued therefore that Plaintiff would be unable to sustain his burden of proving premises liability. Woodlawn supplemented its motion with, among other exhibits, the contracts pertinent to the 2015 construction and with deposition testimony from Woodlawn, Acme, and ACPI. Woodlawn also included the affidavits of Plaintiff's coworkers on the scene and Plaintiff's deposition.

Following a hearing, the trial court rendered summary judgment in favor of Defendant Woodlawn. By minute entry, the trial court explained:

> Louisiana law requires actual or constructive notice of the allegedly defective skylight, one of the elements of Plaintiff's premises liability claims which Plaintiff has failed to meet. As such, under La.C.C.P Article 966(A)(3) the Court finds that there is no genuine issue of material fact concerning that actual or constructive, and the mover, Woodlawn is entitled to judgment as a matter of law.

It therefore dismissed Plaintiff's claims against Woodlawn.

Plaintiff appeals the resulting October 11, 2019 judgment and assigns the following as error:

> 1. The District Court erred by finding Woodlawn Cemetery, Inc. ("Woodlawn") did not have actual or constructive knowledge of the defective skylight in its building where it is undisputed that Woodlawn owned the building, the skylight defect existed for at least 23 years, and Woodlawn produced no evidence that it ever inspected or maintained the roof or skylight during the 23 years the defect existed.
>
> 2. The District Court erred by finding there are no genuine issues of material fact with regard to Woodlawn's actual or constructive knowledge of the defective skylight in its building where the plaintiff's expert engineer opined the building owners should have known of the unreasonably dangerous condition posed by the skylight panels installed on the roof and should have taken minimal precautions to prevent injury as a result of the defect.

6

3. The District Court erred by resolving disputed facts against the non-moving party in a summary judgment proceeding, specifically finding that Woodlawn did not have constructive knowledge of the skylight defect where the defect existed for at least 23 years was never inspected or maintained.

## LAW AND DISCUSSION

*Summary Judgment – Standard of Review*

Louisiana Code of Civil Procedure Article 966(A)(3) requires a court to grant a motion for summary judgment "if the motion, memorandum, and supporting documents show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law." On appeal, a trial court's ruling on a motion for summary judgment is reviewed de novo. *Bufkin v. Felipe's La., LLC*, 14-288 (La. 10/15/14), 171 So.3d 851. We therefore turn to consideration of Woodlawn's motion for summary judgment.

*Premises Liability*

Plaintiff's petition advanced a cause of action under the concept of premises liability. In such a case, La.Civ.Code art. 2317 provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things we have in our custody." The principle, "however, is to be understood with the following modifications." *Id.* Louisiana Civil Code Article 2317.1 thereafter provides that:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

7

Thus, a plaintiff seeking premises recovery under La.Civ.Code art. 2317.1 must prove:

> (1) that the thing which caused the damage was in the defendant's custody or control, (2) that it had a vice or defect that presented an unreasonable risk of harm, (3) that the defendant knew or should have known of the vice or defect, (4) that the damage could have been prevented by the exercise of reasonable care, and (5) that the defendant failed to exercise such reasonable care.

*Owens v. McIlhenny Co.*, 18-754, p. 3 (La.App. 3 Cir. 3/27/19), 269 So.3d 839, 842 (quoting *Riggs v. Opelousas Gen. Hosp. Tr. Auth.*, 08-591, p. 4 (La.App. 3 Cir. 11/5/08), 997 So.2d 814, 817). *See also Grossie v. MGM Props., Inc.*, 18-224 (La.App. 3 Cir. 4/10/19), 269 So.3d 921. A plaintiff's failure to provide proof of any one of the elements is fatal to his or her claim. *Owens*, 269 So.3d 839.

In its motion for summary judgment, Woodlawn focused its argument on the elements of 1) custody and control and 2) actual or constructive notice of the purported defect. Although Plaintiff observes that the trial court focused on a lack of evidence regarding notice—and he in turn addresses that finding in his appellant's brief—this court's review of a ruling on a motion for summary judgment is de novo. Even had the trial court limited its review to that single element,[6] it would be of no moment. We consider the elements in turn.

*Custody/Control*

Woodlawn maintained in its motion that genuine issues of material fact do not exist with regard to whether it had custody or control of the area in which the accident occurred given the fact that it was an active construction zone. Conceding

---

[6] The trial court's minute entry reflects broadly that: "Louisiana law requires actual or constructive notice of the allegedly defective skylight, *one of the elements of Plaintiff's premises liability claims which Plaintiff has failed to meet*." Seemingly, the trial court found notice to be only one of the elements lacking proof.

its ownership of the premises, Woodlawn points out that premises liability "is based on custody, not ownership." *Migliori v. Willows Apartments*, 98-1814, p. 5 (La.App. 4 Cir. 2/3/99), 727 So.2d 1258, 1260, *writ denied*, 99-873 (La. 5/14/99), 741 So.2d 662. In this regard, this court has explained that "the owner of a building under construction or renovation generally does not have custody for purposes of liability" based on the principles of La.Civ.Code art. 2317 and La.Civ.Code art. 2317.1. *See Schram v. Colony Specialty Ins. Co.*, 16-958, p. 7 (La.App. 3 Cir. 12/29/16) (unpublished opinion).[7] *See also Sasser v. Wintz*, 11-2022 (La.App. 1 Cir. 9/4/12), 102 So.3d 842; *Migliori*, 727 So.2d 1258. The court must inquire "whether the defendant had the right of direction or control over the thing and what, if any, benefit the defendant derived from the thing." *Jordan v. Thatcher Street, LLC*, 49,820 (La.App. 2 Cir. 6/10/15), 167 so.3d 1114 (citing *Doughty v. Insured Lloyds Ins. Co.*, 576 So.2d 461 (La.1991)).

The record confirms Woodlawn's assertion regarding the lack of evidence of its custody over the site at the time of Plaintiff's fall and injury. The documentary evidence verifies Woodlawn's status as a non-profit corporation, administered by a seven-member board of directors. Roy Geesey, President of Woodlawn Cemetery, Inc., described Woodlawn as a "small town cemetery" with no employees, let alone any employees on site at the time of the construction.

Mr. Geesey testified that Woodlawn engaged Acme, as it had in 1992 with the construction of the original mausoleum, to design, build, and ultimately market the 2015 addition. Acme controlled all aspects of the construction, including contracting of subcontractors, in this case ACPI, for the actual physical labor and

---

[7] 2016 WL 7475827

materials. Mr. Geesey described its contract with Acme as "turnkey" and that it enabled Acme to do whatever it needed to do to complete the mausoleum. He explained that no one restricted the construction workers from going on the roof, that Woodlawn had no knowledge of anyone going onto the roof during the construction, and that the cemetery, instead, relied on Acme to ensure the site was safe.

Plaintiff did not counter this evidence regarding Woodlawn's lack of direction and control over the site. He pointed to no testimony indicating that Woodlawn took an active part in the scope of the work site, the way in which the ACPI employees performed their work, the location at which they performed their work, or the way in which they were supervised. Plaintiff likewise presented no evidence of input from Woodlawn or even any interaction between Woodlawn and ACPI personnel.

To the contrary, Mr. White, who acted as corporate representative for Acme in its deposition, explained as follows in questioning regarding his relationship with Woodlawn and the lack of the Woodlawn's oversite:

> Q      Are you aware of any restrictions that Woodlawn placed on Acme in terms of access of the site where construction was going to take place?
>
> A      No.   Let me back up on that last question and answer.
>
> Q      Sure.
>
> A      Restrictions that Woodlawn placed on access to the site. Now, this is a cemetery with ongoing interments and it was understood that there were people that were going to be buried there, and so we would have to accommodate, you know, stop work when there was a funeral or those kinds of things and we couldn't block access to tombs and the existing mausoleum.
>
> Q      Did Woodlawn give Acme any instructions on how to go about the construction of these additions?
>
> A.      No.

Further removed from Woodlawn, Mr. White testified to the relationship between Acme and ACPI regarding operational control of the site and explained:

> Q    If Acme wanted to put up some sort of fence or protective area around where the construction was taking place, would they have been permitted to do so?
>
> A    That's an interesting question.  The responsibility for construction, including the management of the site, construction site and safety is [ACPI].
>
> If I saw something that was unsafe, just because I was in the neighborhood and brought it to Frank Nodier's[8] attention, I'm sure he would look into it and address the issue, but that never happened.  I never saw anything like that.
>
> Q    My question is, if Acme wanted to make a protective fence or any sort of barrier around the area where construction was taking place, would they have been prevented from doing so?
>
> A    If we would have put that in our agreement with [ACPI], certainly, I don't think he would have objected to that.

Finally, as indicative of the evidence of Woodlawn's distant relationship to the day-to-day operations of the construction project, Mr. Geesey confirmed that the cemetery was not made aware of Plaintiff's accident, or even the existence of the broken skylight, at the time it occurred.  Woodlawn learned of the injury only at the time suit was filed one year after the accident's occurrence.  While ownership is clear, Plaintiff has not demonstrated that genuine issues of material fact exist regarding Woodlawn's custody or control of the purportedly defective skylight at the time of this construction-related accident.  Accordingly, summary judgment was appropriate.

---

[8] Mr. White described Mr. Nodier as the owner of ACPI.

*Actual or Constructive Notice*

Neither is there merit in Plaintiff's contention that the trial court erroneously determined that it failed to establish genuine issues of material fact on the issue of actual or constructive notice. On this point, Plaintiff does not challenge Woodlawn's assertion that it did not have actual notice in the twenty-three year history of the skylight that it posed a threat to a workman on its roof. Nor did it have notice that the skylight was out of compliance with any applicable construction code.

Plaintiff instead points to jurisprudence that he contends stands for the broad proposition that constructive notice exists if an injury-causing condition existed for such a period of time that the responsible party must have discovered it in the exercise of ordinary care and diligence. *Citing, e.g., Dronette v. Shelter Ins. Co.*, 08-654 (La.App. 3 Cir. 12/10/08), 998 So.2d 942; *Blount v. East Jefferson Gen. Hosp.*, 04-407 (La.App. 5 Cir. 10/12/04), 887 So.2d 535; *Joseph v. City of New Orleans*, 02-1996 (La.App. 4 Cir. 3/5/03), 842 So.2d 420.

Plaintiff's argument, however, conflates the element of the existence of a defect with the separate element of notice, actual or otherwise. The fact-specific jurisprudence referenced by Plaintiff does not indicate that the passage of time—alone—eliminates a plaintiff's burden of proving notice. It is instead a fact-bound inquiry.

In both brief and in oral argument, Plaintiff advances *Dronette*, 998 So.2d 942, for the proposition that the absence of periodic inspections is a significant factor in finding constructive knowledge. Although *Dronette* involved a construction worker's injury, the remaining facts of that case are strikingly different from this matter. The homeowners in that earlier case retained the services of the plaintiff and his father, a carpeting contractor, to remove carpeting from their home. While doing

12

so the plaintiff made contact with a second-floor balcony railing while throwing bundles of carpeting to the ground, sustaining injury due to a fall. The plaintiff alleged that the defendant homeowners, the Bordlees, had knowledge of the purported defect as "it takes considerable time for decay to develop" and, therefore, the defendants "should have known there was rotten wood in their balcony railings." *Id.* at 945. The trial court rejected that argument, and this court affirmed, finding that the homeowners had neither actual nor constructive notice.

The *Dronette* panel pointed out that no one involved had "observed any rotten spots prior to the accident" and, furthermore, the defendants "certainly did not ignore the condition[.]" *Id.* The defendants instead requested a contractor's inspection of the railing as, about three days prior to the accident, Mrs. Bordlee became concerned, in part, "about one of the balcony's railing's rattling spindles." *Id.* at 944. The defendants' contractor undertook a fifteen to thirty minute inspection, grabbing and shaking the railing before "concluding that there was nothing unsafe about the balcony's condition." *Id.* Also, the plaintiff's father admitted that he had been on the balcony before the accident to examine "whether it was safe to throw the carpet over the railing" and that the inspection did not reveal anything out of the ordinary. *Id.* at 944. Relying upon those inspections, this court explained that as "both contractors concluded that the balcony was in good and safe condition[,]" "[i]t is very difficult for us to imagine what else these *homeowners* could have reasonably done to discover the rotten wood." *Id.* at 945 (emphasis in the original).

In contrast to the *Dronette* homeowners who were prompted to seek an inspection upon discovery of a rattling spindle, Plaintiff in this case presented *no facts* indicating that Woodlawn should have been similarly prompted to seek inspection of the skylight. Instead, all evidence indicates no reporting of prior

13

problems or incidents with the skylight. That factual distinction undermines Plaintiff's contention that the *Dronette* panel's statement that it "may have been more receptive to the [plaintiff's] argument if [the defendants] had not requested the inspection[,]" is determinative in this case. *Id.* at 945. The evidence in this case does not indicate that Woodlawn was similarly called upon to have its premises inspected when, in fact, it knew of no suspicious condition, nor even that ACPI workers would be in the vicinity of the skylight.

In *Joseph*, 842 So.2d 420, another of the cases relied upon by Plaintiff, the complained of defective sidewalk was remarked to have been in regular use and to have been heavily trafficked for a period of up to ten years. The appellate court referenced the sidewalk's "obvious state of disrepair" as reflected by photographic evidence. *Id.* at 425. In *Blount*, a case addressing "constructive notice" for purposes of public entity liability under La.R.S. 9:2800(C), the fifth circuit affirmed the trial court's determination that the plaintiff in that case failed to prove that she would meet her burden of proving notice of a spill when there was no evidence regarding the length of the existence of the condition. Notably, La.R.S. 9:2800(D) (emphasis added) provides that, for purposes of that statute, "[c]onstructive notice shall mean *the existence of facts* which infer actual knowledge."

In this case, Plaintiff failed to come forward with disputed factual issues. He simply pointed to the existence of a skylight that did not bear his weight and, in turn, alleged that Woodlawn should have discovered its non-load bearing condition with reasonable care. While he offered an expert's engineering report indicating that the skylight posed an unreasonable risk of harm in that it did not meet certain regulatory

standards of care,[9] Woodlawn did not challenge the existence of a defect for the limited purposes of this summary judgment proceeding. Instead, on the contested issue of notice, the engineering report offers the conclusory opinion that the cemetery "should have previously taken (and currently taken) the minimal precautions necessary to protect the life and safety of persons allowed on the roof" given the skylight's condition. This conclusion, however, lacks factual background that would have conveyed notice, actual or constructive.

To be clear, Plaintiff sustained injury on the roof of an existing mausoleum where Plaintiff's employer, ACPI, was performing work related to the construction of an adjacent structure. ACPI had control of the entire worksite. Inexplicably given

---

[9] The report indicated, in part, that:

Minimum standards of care are established by model safety codes and publications including but not limited to; the International Building Code (IBC), the United States Department of Labor Occupational Safety and Health Administration (OSHA), National Institute for Occupational Safety and Health (NIOSH), American Architectural Manufacturers Association (AAMA), American Society for Testing and Materials (ASTM International), among others. The OSHA standard Guarding Floor and Wall Openings and Holes – 1910.23(a)(4) states "…skylights in the roof of buildings through which persons may fall while walking or working shall be guarded by a standard skylight screen or a fixed standard railing on all exposed sides."

In an article titled "Skylight fall protection: More than just the manufacturer's responsibility" by John Lewis (previous Technical Director of AAMA)) and published February 19, 2009, Mr. Lewis writes, "Signage should be posted by the building owners and managers at each access point on the roof, communicating roof safety and inherent dangers." Clearly this indicates that some sort of signage and/or markings should be posted on the roof by building owners where skylights exist without fall protection screens.

During the site investigation, our office noted that the subject skylight did not display building code required labeling that would indicate performance compliance with AAMA/WMDA/CSA 101/I.S.2/A440. The plastic skylight was flimsy and easily moved under minimal hand pressure. Furthermore, we noted that no skylight protection screen had been installed on the subject skylight, nor on the remaining skylights. We noted that many tripping hazards, including excessive roof curbs, existed near the subject skylight. We noted that there were no markings or signage warnings of the dangers of falling through the skylight. Clearly, no measures had been taken by the building owners to safeguard against the unreasonably dangerous hazard of falling through the skylight.

its approximately twenty-foot [10] distance from the construction site, Plaintiff seemingly fell backward onto the skylight which then collapsed under his weight.

When asked if he had "any idea" how Plaintiff fell through the skylight, Mr. Wright stated that he had "no clue why he was back there." He noted the distance between the area in which the team was working and the skylight, a distance he estimated to be "fifteenish feet." As ACPI Superintendent, he expected the workers to stay in the area "[w]here the materials were[.]"

Simply put, there was no evidence that Woodlawn either had custody or control of this skylight at the time of the construction project, or that it had notice of any defect. To the contrary, this skylight was located on top of an existing mausoleum previously built by Plaintiff's employer, ACPI, and not the mausoleum addition under construction. The "skylight," obviously, was intended only to let in sunlight on the space below. Plaintiff failed "to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law." La.Code Civ.P. art. 966(D)(1). Accordingly, the trial court did not err in its entry of summary judgment in favor of Woodlawn.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this proceeding are assessed to Plaintiff/Appellant, Devin Sanders.

**AFFIRMED.**

---

[10] Plaintiff's expert engineering report indicates that "the subject skylight was located approximately 20 feet east of the rear addition[.]"

16